AO 106 (Rev. 01/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Western District of Arkansas

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| SEARCH OF rlindsey0910@gmail.com THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, INC. | ) ) ) ) |

Case No. 5:22cm28-CDC

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____Western_____ District of _____Arkansas_____ *(identify the person or describe property to be searched and give its location)*: See "Attachment A"

This court has authority to issue this warrant under 18 U.S.C. §§ 2703(c)(1)(A) and 2711 (3)(A) and Federal Rule of Criminal Procedure 41

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:  See "Attachment B"

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of ___18___ U.S.C. § ___1343/371___ , and the application is based on these facts:  Wire Fraud and Conspiracy to Commit Wire Fraud--See Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Dylan Critten, HSI Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 13 2022 @ 10:52am

_____
*Judge's signature*

City and state:  Fayetteville, Arkansas

Christy D. Comstock US Magistrate Judge
*Printed name and title*

## ATTACHMENT A

### Place to Be Searched

This warrant applies to information associated with **rlindsey0910@gmail.com** which are stored at premises owned, maintained, controlled, or operated by Google, Inc. a company headquartered at Google, Inc., 1600 Amphitheatre Parkway, Mountain View, California 94043.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Google, Inc.**

To the extent that the information described in Attachment A is within the possession, custody, or control of **Google, Inc.,** including any emails, records, files, logs, or information that have been deleted but are still available to **Google, Inc.**, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), **Google, Inc.** is required to disclose the following information to the government for each account or identifier listed in Attachment A, for the period October 21, 2014 through present unless otherwise stated:

a.     The contents of all e-mails stored in the account, as well as emails in storage under, and associated with, any preservation numbers associated with the account, including draft emails, emails sent to and from the account, and emails deleted from the account;

b.     With no restriction as to date, all records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the types of service utilized, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative e-mail addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

c.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, and files;

d.     All content in the Documents, Calendar, Friend Contacts and Photos areas;

e.     Any and all Yahoo IDs listed on the subscriber's Friends list; and,

      f.     All records pertaining to communications between **Google, Inc.** and any person regarding the account, including contacts with support services and records of actions taken.

**II.    Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 912 (impersonation of a federal officer or employee), 18 U.S.C. § 371 (conspiracy), and 18 U.S.C.§ 1343 (wire fraud) including, for each account or identifier listed on Attachment A, information pertaining to the following matters:

a) Communications involving known and unknown co-conspirators;

b) The contents of any such communications that will assist investigators in ascertaining the nature and scope of the crimes under investigation, the true identity and/or location of the subjects and their co-conspirators, the names, addresses, and locations of victims, and any disposition of the proceeds of the crimes under investigation;

c) Communications relating to the transfer of money, stored value cards, money orders, bank deposits, Voice over Internet Protocol (VoIP) telephone lines, invoicing, fees, bank account numbers, wire transfers, call centers, lead lists, lead aggregation data, payments, monthly billing, or production or the movement of proceeds or expenses associated with any of the above;

d) Records relating to indicia of ownership including who created or used the account or identifier, including records about their identities and whereabouts.

ATTACHMENT C

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF ARKANSAS

| | | |
|---|---|---|
| STATE OF ARKANSAS | : | |
| | : | |
| | : | |
| | : | |
| COUNTY OF WASHINGTON | | |

### Affidavit in Support of Application for Search Warrant

I, Dylan Critten, a Special Agent with Homeland Security Investigations (HSI), being duly sworn, hereby depose and state as follows:

1.     I make this affidavit in support of an application for a search warrant for information associated with email account **rlindsey0910@gmail.com** (hereinafter the "SUBJECT EMAIL ACCOUNT") that is stored at premises owned, maintained, controlled or operated by **Google, Inc.** an e-mail provider headquartered at Google, Inc., 1600 Amphitheatre Parkway, Mountain View, California 94043. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require **Google, Inc.** to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the accounts, including the contents of communications.

2.     I am a Special Agent with the Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI) and have been since December 1, 2009. In my experience in federal law enforcement, I have participated in and conducted numerous complex criminal investigations including investigations of India-based call centers engaged in various telephone and email extortion schemes. I received extensive

instruction and training at the Federal Law Enforcement Training Center (FLETC) relating to general investigative techniques, electronic surveillance, rules of evidence and legal principles and statutes pertaining to criminal violations of federal law, including but not limited to, U.S. customs and immigration offenses, money laundering, currency violations, wire fraud, mail fraud, conspiracy and document and benefit fraud instruction and training at the Federal Law Enforcement Training Center (FLETC) relating to general investigative techniques, electronic surveillance, rules of evidence and legal principles and statutes pertaining to criminal violations of federal law, including but not limited to, U.S. customs and immigration offenses, money laundering, currency violations, wire fraud, mail fraud, conspiracy and document and benefit fraud.

3.      By virtue of my employment as a Special Agent, the federal crimes I am assigned to investigate include, but are not limited to, violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 1001 (false statements), 18 U.S.C. § 1028 (identity theft), 18 U.S.C. § 1028A (aggravated identity theft), 18 U.S.C.§ 1343 (wire fraud), 18 U.S.C. § 1344 (bank fraud), and 18 U.S.C. § 1956 (money laundering). As a Special Agent I am personally familiar with and have used all normal methods of investigation, including, but not limited to, visual surveillance, electronic surveillance, informant and witness interviews, interrogation, and undercover operations. I have performed various tasks, which include, but are not limited to: functioning as a surveillance agent; participating in the tracing of monies and assets obtained by illicit activities within the United States and abroad; interviewing witnesses, cooperating individuals and informants; functioning as a case agent; authoring and executing Federal search warrants for evidence of crimes against the United States; and participation in the arrests of numerous individuals for violations of the United States Code.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## STATUTORY AUTHORITY

5.      This investigation concerns alleged violations of Title 18, United States Code, Section 1343 (Wire Fraud) and Section 371 (Conspiracy to Commit Wire Fraud).

a.      Under 18 U.S.C. Section 1343, it is a federal crime for any person to devise or intend to device any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television in interstate or foreign commerce, any writing, sign, signals, or pictures, or sounds for the purpose of executing such scheme or artifice. Further under 18 U.S.C. Section 371, it is a federal crime for two or more persons to conspire to commit any offense against the United States.

## DEFINITIONS

6.      Robocalls are telephone calls made through an automated process that places large volumes of calls over the internet in order to deliver recorded messages and entice a callback from the recipient, in contrast to calls placed one at a time by a live person. Robocalls can be placed using Voice Over Internet Protocol (VoIP).

7.      Voice Over Internet Protocol (VoIP) is a method and group of technologies for the delivery of voice communications (telephone calls) over the internet. VoIP calls in the United States are often routed through many intermediary VoIP companies. Auto-dialer software, which

is commonly hosted on various cloud-based server accounts controlled by the robocallers, facilitates this VoIP telephone traffic.

8.      Criminal India-based call centers and their intermediaries responsible for much of this scam robocall traffic often use automated dialer software programs to target thousands or more U.S.-based phone numbers with scam calls.  Victims are often solicited by multiple telephone numbers over an extended duration as a part of the same scheme.  These include spoofed numbers, which impersonate official government, corporate, and other telephone numbers and leave voicemails with intimidating and/or misleading messages with call-back telephone numbers.  These 10-digit call-back telephone numbers, which the telecom industry refers to as Direct Inward Dial (DID) numbers or Toll-Free Numbers (TFN), are often provided to the criminal call centers by both small, intermediary VoIP telecom providers such as TextNow and larger companies such as Google.

9.      Caller ID spoofing, more commonly referred to as "spoofing," is the practice of causing the telephone network to indicate to the receiver of a call that the originator of the call is calling from a telephone number that they do not own or possess the rights to.  Spoofing can falsely afford a scam caller increased legitimacy when phone numbers associated with official government or official corporate entities appear on the call recipient's caller ID.

10.      Remote Access Tools (RATs) such as AnyDesk, UltraViewer, TeamViewer and others are software tools that provide the ability for others to remotely access your computer and/or smartphone.  Scammers often download RATs or cause them to be downloaded to victim devices under the false premises of offering technical support assistance or refunds.  Remote access affords scammers opportunities to view complete banking login information, personally identifiable information of victims, and other private communications including telephone calls and emails.

Remote Access Tools allow scammers to login to banking portals using the victim's banking credentials without the victim's knowledge. Scammers remoting through the victim's computer (and using the true banking customer's IP address) are often able to conduct banking transactions using the victim's bank account(s) without alerting bank security.

## BACKGROUND

11.     In January 2013, Homeland Security Investigations (HSI) began receiving reports that Indian nationals and U.S. citizens were being defrauded through various telephone scams from callers purporting to be officers from DHS, USCIS, IRS, or other law enforcement agencies. Victims reported that they were told that they had an outstanding tax debt and/or order of deportation. Victims were threatened with arrest and/or deportation if they did not clear the warrant by paying fines, fees, and/or security deposits.

12.     HSI partnered with the Treasury Inspector General for Tax Administration (TIGTA), DHS Office of the Inspector General (DHS-OIG), and numerous state and local officers to combat telephone scams which appear to be occurring on an industrial scale. TIGTA has reported that from June 2013 through the present, the TIGTA has received more than 40,000 contacts from individuals who believed that they were contacted by IRS impersonators and more than $50 million dollars in reported IRS scam losses. Victims have been identified in all 50 of the United States.

13.     India-based call centers operating these government impersonation scams have largely evolved and diversified their schemes in order to attract less U.S. government and law enforcement attention. New variations of tech-support refund scams, which instead impersonate U.S.-based corporations and banks, appear to have surpassed government imposter scams and are leading to unprecedented victim losses. Tech-support refund scams include variations of bank

imposter, Amazon imposter, Microsoft imposter and others typically originate with a pop-up ad or email alerting the victim to computer problems or charges for purchases in which they did not make. This prompts the victim to place a telephone call soliciting technical-support and/or refund assistance. These tech-support calls often involve transfers to other fake imposter "partner" corporations for the purpose of catching hackers and/or protecting the victim's information from being compromised. Bank impersonations involving spoofing of official banking telephone numbers often convince victims they are assisting the bank with internal and corporate security measures to safeguard accounts.

14.    Victims of tech-support refund scams often report to law enforcement that they believed they were speaking to legitimate government and/or banking officials. The scam callers take steps to obtain personal information about their victims in order to add credibility to their call. Additionally, the scammers are utilizing advanced techniques to not only mask their location but to change or "spoof" their telephone number (i.e. via using software or devices that make it appear the caller is calling from a different number than they are actually calling from/using).

15.    India-based call centers often use automated dialer software programs to target thousands of telephone numbers with unwanted SPAM phone calls. Victims are solicited by voicemails which leave intimidating messages with call-back telephone numbers. These call-back telephone numbers are changed very quickly by Indian call centers. These call-back telephone numbers, which the telecom industry refers to as Direct Inward Dial (DID) numbers (DID are the same as standard 10 digit telephone numbers with localized area codes), are often provided to the call centers by small, intermediary telecom providers. The small, intermediary providers purchase blocks of DIDs from more established wholesale telecom providers. When conducting business with wholesale telecom providers, the third-party intermediaries frequently use tactics like

switching the names of their representatives, business names, and websites. By maintaining a constant stream of alternate business names the third-party intermediaries can maintain a constant supply of DIDs, with which to supply the call centers, even if some of their businesses have their contracts terminated by wholesale telecom providers when fraudulent calls are reported.

16.     The end-points of calls received by DID telephone numbers are difficult to determine because there are typically multiple companies involved in the wholesale distribution chain.    The call centers direct the incoming DID telephone numbers to an IP address on their VoIP networks which further complicates call tracing.

17.     Various financial products have been used by scammers to receive victim funds. These methods include direct wire transfers, purchase of stored value cards such as a Green Dot MoneyPak or a Reloadit pack, General Purpose Reloadable (GPR) cards, victims directly depositing cash into unwitting money transfer recipients and/or accomplice bank accounts, MoneyGram and/or Western Union transactions which are picked up by conspirators using false identity documents, iTunes gift cards, and digital currency (i.e. bitcoin). Instructions are given to the victim telephonically, and the victim also gives information telephonically regarding the debit card, money wire, and/or gift card to the scammers. This allows the scammer network to use a combination of online and/or domestic retail store transactions to liquidate victim funds.

18.     Victim information is typically purchased from U.S.-based data brokers who provide the India-based call centers "lead lists" or "leads." "Short-form" lead lists contain minimal data fields usually consisting of name and telephone number. "Long-form" lead lists, needed to register debit cards, contain the name, date of birth, social security, address, and often other fields including telephone number of U.S. persons. Short-form lead lists are often converted to long-

form lead lists by India-based call centers through phishing, sales calls, social engineering, and/or other methods.

19.      Historically, numerous persons ("runners") involved in money laundering of telefraud victim funds did so through the use of GPR cards which they purchased at various retail stores inside the United States. GPR cards held by conspirators were purchased and registered to a false identity before the call centers loaded them with victim funds. These GPR cards were used to purchase money orders or receive cash from ATMs. This activity took place very quickly and usually occurred before the crime could be reported to police or financial institutions.

20.      Current tech-support refund scam victims have lost money through high dollar bank wires directed to crypto-currency accounts. These transactions are larger and move faster than ever before. The money can be moved through multiple unknown crypto-currency accounts by conspirators outside of the United States before it is even reported to police or financial institutions.

21.      Email accounts used in telefraud schemes are often by scammers to share criminal scripts, contact victims, register debit/gift cards loaded with victim funds, share consumer data (victim lead lists), register cryptocurrency accounts, register financial services accounts, setup telecom services (i.e. Textnow and/or Google Voice), terminate telecom services (when victims' have reported the phone numbers to law enforcement), and/or setup remote access tool service. These "dummy" email accounts often use fake names for the purpose of anonymizing unlawful activity. The scammers often use multiple "dummy" email accounts which interact with one another as well as telecom and/or other businesses offering services needed to carry out the scam. Setting up multiple dummy accounts compartmentalizes portions of the scam and ensures business services continue even when fraud is reported. Setting up dummy accounts also requires the need to keep track of all of the email accounts and passwords. Spreadsheets of dummy email accounts

and passwords used for telefraud have also been found in target account email content. The scammers also often use primary email accounts in order to register and control multiple dummy accounts in the event they lose access to any of the dummy email accounts.

22.    The criminal call centers run their operations like any business. They have adopted business cache and normal business practices like using email in order to appear legitimate to their customers/clients. However, these email addresses use fake names and the "clients" are actually victims. Scammers also setup "dummy" accounts on behalf of victims for the purpose of opening cryptocurrency wallets or other financial accounts in the victims' identities. These dummy email accounts often communicate with one another and with "clients" such as would occur in any office environment. The email accounts and accounts with which they communicate have been found to contain information relevant to identification of scam scripts being run by the criminal call centers, identification of victims, movement of victim funds, spreadsheets detailing call center expenses, spreadsheets detailing earnings and commissions of call center employees, spreadsheets of money laundering activity in the United States and India, as well as indicia of true email account ownership by those who are directing the telefraud scheme(s).

**PROBABLE CAUSE**

23.    On Wednesday June 15, 2022, SA Critten received victim report 22-00887 from the Bella Vista, Police Department. The report indicated elderly victim, identified as B.H., now aged 88, of Bella Vista, AR had sent two wires to persons posing as Microsoft technical support as well as impersonating First Western Bank and United Bank. The individuals corresponded with B.H. by phone and text message using telephones 4254191413 (operated by TextNow) and 4698447261 (operated by Google Voice). The individuals also appear to have gained access to B.H.'s computer after installing an unknown remote access tool.

24.     On June 15, 2022, SA Critten spoke with victim's son who informed that B.H., on or around May 31, 2022, had spoken to "Doug", "Joseph," and "David" posing as a cyber/fraud department employees of Microsoft Corporation and later "Sandy" who posed as a cyber/fraud department employee of First Western.  B.H. was convinced that he was assisting the bank in catching hackers and later wired $280,000 from his First Western bank account to OKCOIN, INC (San Francisco, CA).

25.     On or around June 6, 2022, B.H. had spoken to someone impersonating an employee at United Bank before wiring $24,000 to OKCOIN, INC.  The individual continued to remain in contact with B.H. by calling him for the following week.  It also appears that the individuals spoofed the telephone numbers of United Bank and/or First Western Bank when calling B.H.

26.     On June 17, 2022, SA Critten served TextNow with a Customs Summons for records for telephone 4254191413 and Google Voice with a Customs Summons for records for telephone 4698447261.

27.     On June 20, 2022, SA Critten received records from TextNow which indicate telephone 4254191413 operated by the suspected targets placed telephone calls of significant duration and quantity to B.H.  TextNow records also indicate victim telephone B.H. placed many calls of substantial duration to the suspects operating telephone 4254191413.

28.     According to TextNow records, on 6/7/2022 during the time they were contacting B.H., the suspects were using telephone 4254191413 were using IP address 112.196.93.106.  On 6/20/2022, SA Critten conducted a search of this IP address locating the following results:

Location: Panchkula, INDIA 134102
Latitude: 30.6954
Longitude: 76.8524
ISP: Quadrant Televentures Limited

On 6/20/2022, SA Critten conducted a search of this IP address in centralops.net and returned the

following results:

```
netname:     DSL-BROADBAND
country:     INDIA
descr:       Chandigarh
admin-c:     NN112-AP
tech-c:      NN112-AP
status:      ALLOCATED NON-PORTABLE
mnt-by:      MAINT-IN-NETWORK
last-modified: 2020-05-05T11:44:23Z
mnt-irt:     IRT-ECLTELECOM-IN
source:      APNIC
```

29.    According to Textnow records, on 2022-04-01 22:38:00 UTC, TextNow number

4254191413 was registered by IP address 112.196.93.107 with username yahoo5578 and email

address yahoo55@fmail.com.  TextNow does not verify email addresses of account holders and it

appears that this email address is fictitious.  IP search of 112.196.93.107 returned similar results

as above IP 112.196.93.106.  According to TextNow records, telephone account 4254191413 with

username yahoo5578 was active between April 1, 2022 and June 18, 2022.

30.    On or around 6/30/2022, Google responded with information pertaining to

4698447261 which participated in scamming local victim B.H.  According to Google records,

Google Voice line 4698447261 was operated by Google Account rlindsey0910@gmail.com

bearing the name "Rusty Lindsey" on the same dates (April 1, 2022 to June 18, 2022) as the

TextNow telephone.  On July 5, 2022, SA Critten submitted a preservation request to Google for

this account.  According to Google records, this Rusty Lindsey Google Account was setup on or

around 10/21/2014 using what appears to be a domestic U.S.-based IP address.  According to

Google records, this Google Account also used a backup Yahoo Inc email address

(**legolasrl@yahoo.com**) for account recovery and registration.  On July 5, 2022, SA Critten submitted a preservation request to Yahoo Inc. for this account.

31.    On or about July 5, 2022, SA Critten identified additional victims that communicated with TextNow telephone 4254191413 including J.P. (Franklin, Tennessee) who lost approximately $120,000 in a Microsoft tech-support refund scam.    J.P. reported communicating with scammers named "Rusty" and "Daniel McKay" before wiring funds to San Francisco-based cryptocurrency exchange "OKCOIN." SA Critten also spoke with L.L. (Honolulu, Hawaii) who lost at least $145,000 to a Microsoft and Verity Credit Union imposter scam operated by TextNow telephone 4254191413.  L.L. wired funds to an unknown sub-account held by a New York-based cryptocurrency exchange.

32.    Based on the above information, I believe that there is probable cause to believe that the SUBJECT EMAIL ACCOUNT was used to facilitate the purchase of VoIP telephone numbers that were used by individuals in India engaged in a corporate/banking imposter scheme for the purpose of defrauding victims in the United States resulting in wire transfers in violation of 18 U.S.C. § 1343 and conspiracy to commit the fraud set forth above in violation of 18 U.S.C § 371.

33.    In my training and experience, I have learned that **Google, Inc.** provides a variety of on-line services, including electronic mail ("e-mail") access, to the general public.  **Google, Inc.** allows subscribers to obtain e-mail accounts at the domain name **gmail.com**, like the e-mail account listed in Attachment A.  Subscribers obtain an account by registering with **Google, Inc.** During the registration process, **Google, Inc.** asks subscribers to provide basic personal information.  Therefore, the computers of **Google, Inc.** are likely to contain stored electronic communications (including retrieved and un-retrieved e-mail for **Google, Inc.** subscribers) and

information concerning subscribers and their use of **Google, Inc.,** services, such as account access information, e-mail transaction information, and account application information. Even if this information is falsely given it can still provide indicia of ownership for the email account.

34. In general, an e-mail that is sent to a **Google, Inc.** subscriber is stored in the subscriber's "mail box" on **Google, Inc.** servers until the subscriber deletes the e-mail. If the subscriber does not delete the message, the message can remain on **Google, Inc.** servers indefinitely. Even if the subscriber deletes the e-mail, it may continue to be available on **Google, Inc.**'s servers for a certain period of time.

35. When the subscriber sends an e-mail, it is initiated at the user's computer, transferred via the Internet to **Google, Inc.**'s servers, and then transmitted to its end destination. **Google, Inc.** often saves a copy of the e-mail sent. Unless the sender of the e-mail specifically deletes the e-mail from the **Google, Inc.** server, the e-mail can remain on the system indefinitely. Even if the sender deletes the e-mail, it may continue to be available on **Google, Inc.**'s servers for a certain period of time.

36. A sent or received e-mail typically includes the content of the message, source and destination addresses, the date and time at which the e-mail was sent, and the size and length of the e-mail. If an e-mail user writes a draft message but does not send it, that message may also be saved by **Google, Inc.** but may not include all of these categories of data.

37. A **Google, Inc.** subscriber can also store files, including e-mails, address books, contact or buddy lists, calendar data, pictures, and other files, on servers maintained and/or owned by **Google, Inc.**

38. Subscribers to **Google, Inc.** might not store on their home computers copies of the e-mails stored in their **Google, Inc.** account. This is particularly true when they access their

**Google, Inc.** account through the web, or if they do not wish to maintain particular e-mails or files in their residence.

39.    In general, e-mail providers like **Google, Inc.** ask each of their subscribers to provide certain personal identifying information when registering for an e-mail account. This information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative e-mail addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number).

40.    E-mail providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via **Google, Inc.'s** website), and other log files that reflect usage of the account. In addition, e-mail providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the e-mail account.

41.    In some cases, e-mail account users will communicate directly with an e-mail service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. E-mail providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications.

42.     In my training and experience, evidence of who was using an e-mail account may be found in address books, contact or buddy lists, e-mail in the account, and attachments to e-mails, including pictures and files.

### INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require **Google, Inc.** to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

### CONCLUSION

Based on the forgoing, I request that the Court issue the proposed search warrant.This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).


Respectfully submitted,


DYLAN CRITTEN
Special Agent
Department of Homeland Security
Homeland Security Investigations

Affidavit subscribed and sworn to before me this _____ 13 _____ day of July _____ 2022

_____
Christy Comstock
United States Magistrate Judge